Joseph H. Harrington
Acting United States Attorney
Eastern District of Washington
Stephanie A. Van Marter
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone: (509) 353-2767

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jul 29, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,

Plaintiff,

v.

MARILOU MARTINEZ,

Defendant.

4:20-CR-06029-SAB-7

Plea Agreement

Plaintiff, United States of America, by and through Joseph H. Harrington,

Acting United States Attorney for the Eastern District of Washington, Stephanie A.

Van Marter, Assistant United States Attorney for the Eastern District of Washington,

and Defendant Marilou Martinez, as well as Defendant's counsel, Houston Goddard,

agree to the following Plea Agreement:

1.    Guilty Plea and Maximum Statutory Penalties:

Defendant, Marilou Martinez (hereinafter Defendant), agrees to plead guilty to

Count 1 of the Indictment dated October 21, 2020, charging Defendant with

Conspiracy to Provide Prohibited Objects to an Inmate of a Prison in violation of 18

U.S.C. § 1791(a)(1), (a)(2), (b)(1), (b)(2) (b)(3), (b)(4) and (c), all in violation of 18 U.S.C. § 371.

Defendant understands that this is a Class D Felony carrying the following penalties: a term of imprisonment of up to 5 years; a fine not to exceed $250,000; a term of supervised release of up to 3 years; and a $100 special penalty assessment.

Defendant understands that a violation of a condition of supervised release carries an additional penalty of re-imprisonment for up to two years without credit for time previously served on post-release supervision. *See* 18 U.S.C. § 3583(e)(3).

2.   The Court is Not a Party to the Agreement:

The Court is not a party to this Plea Agreement and may accept or reject this Plea Agreement. Sentencing is a matter that is solely within the discretion of the Court. The Defendant understands that the Court is under no obligation to accept any recommendations made by the United States and/or by the Defendant; that the Court will obtain an independent report and sentencing recommendation from the U.S. Probation Office; and that the Court may, in its discretion, impose any sentence it deems appropriate up to the statutory maximums stated in this Plea Agreement.

The Defendant acknowledges that no promises of any type have been made to the Defendant with respect to the sentence the Court will impose in this matter.  The Defendant understands that the Court is required to consider the applicable sentencing guideline range but may depart upward or downward under the appropriate circumstances.

The Defendant also understands that should the sentencing judge decide not to accept any of the parties' recommendations, that decision is not a basis for withdrawing from this Plea Agreement or a basis for withdrawing his plea of guilty.

3.    Waiver of Constitutional Rights:

Defendant understands that by entering this plea of guilty Defendant is knowingly and voluntarily waiving certain constitutional rights, including:

a)    The right to a jury trial;

b)    The right to see, hear, and question the witnesses;

c)    The right to remain silent at trial;

d)    The right to testify at trial; and

e)    The right to compel witnesses to testify.

While Defendant is waiving certain constitutional rights, Defendant understands he retains the right to be assisted through the sentencing and any direct appeal of the conviction and sentence by an attorney, who will be appointed at no cost if Defendant cannot afford to hire an attorney. Defendant also acknowledges that any pretrial motions currently pending before the Court are waived.

4.    Elements of the Offense:

The United States and Defendant agree that in order to convict Defendant of Possession with Conspiracy to Provide Prohibited Objects to an Inmate of a Prison in violation of 18 U.S.C. § 371, the United States would have to prove beyond a reasonable doubt the following elements:

*First*, beginning on a date unknown but by December 2019, and continuing until on or about April 21, 2020, in the Eastern District of Washington, there was an agreement between Defendant and at least one other person to commit the crime of Providing a Prohibited Object to an Inmate of a Prison, in violation of 18 U.S.C. § 1791(a)(1), (b)(4);

*Second*, Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

*Third*, Defendant performed at least one overt act for the purpose of carrying out the conspiracy.

5.    Factual Basis and Statement of Facts:

The United States and Defendant stipulate and agree that the following facts are accurate; that the United States could prove these facts beyond a reasonable doubt at trial; and these facts constitute an adequate factual basis for Defendant's guilty plea. This statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts relevant to the guideline computation or sentencing, unless otherwise prohibited in this agreement.

**SEIZURE OF LG CELLULAR PHONE AT THE BENTON COUNTY JAIL, KENNEWICK, WASHINGTON February 3, 2020**

On February 2, 2020, Benton County Jail inmate, hereafter referred to as Cooperating Defendant (CD), wrote a note advising Corrections Officer Brady Haynes that "CO Christian", later identified as Benton County Jail Corrections Officer CHRISTIAN, was bringing contraband into the jail to include suspected narcotics and cell phones. More specifically, the CD advised that there was a contraband cell phone

in Pod 301, cell 24.  The CD provided this information in the hopes that he would get an expedited medical appointment with the jail nurse to examine a minor medical issue, which he did.

Based in part on the above information, on February 3, 2020, the Benton County Jail staff conducted searches of the common areas of POD 301 at the Benton County Jail Facility (7122 W. Okanogan PL, Kennewick, Benton County, WA). CO Montelongo and CO Alumenger located a contraband phone in the janitor's closet within POD 301.   The Benton county Jail has a contract with the United States Marshal Service to house federal inmates, this agreement makes Benton County Jail a federal detention facility.  Cellular devices and narcotics as defined 18 U.S.C.§ 1791(d)(1)(B)(C) and (F) are strictly prohibited therefore, they are considered to be contraband in violation of 18 U.S.C. § 1791(a), criminalizing the Possession/Introduction of Contraband into a federal detention facility.

Based upon the recovery of the phone, Det. Martinez responded to the jail reference the reported contraband and interviewed the CD.  The following is a summary only of the information provided by CD as reported to Benton County Detectives.  The CD reported that on the February 2, 2020, the CD heard a noise through the wall between his cell and cell 24 which sounded like a cell phone on vibrate mode.  CD advised that although he did not see the phone, just before locking down that evening, HORNTVEDT offered to call a family member of the CD.  When the CD questioned how that could be done since it was almost lock down and they no

*United States v. Marilou Martinez* - Plea Agreement - 5

longer had access to the phones, HORNTVEDT asked for the number and advised he was going to call right now and repeated, "No, I'm going to do it right now."

The CD also advised that he had heard two inmates arguing on a prior occasion in Pod 301 about a charger being confiscated.  Det. Martinez later confirmed that on January 31, 2020 Corrections Officer Raul Rodriguez seized a cell phone charger from inmate Maxwell Jones.  The charging brick half was still plugged into the wall hidden in a common area of the pod by the law library cart, while the charging cord that plugged into the power brick was seized from Inmate Jones' pocket.

The CD advised that he had also heard the buzzing of what he assumed was a cell phone when he was housed in cell 14 in Pod 301.  The CD believed it to be a cell phone because he had also heard music playing.  He was not sure whether the sound was coming from cell 13 or cell 15, as he did not recall what way the numbers went. In an effort to try and identify which cell the CD was referring, Det. Martinez confirmed through a review of jail records that the CD was housed in cell 14 immediately prior to being moved to cell 25, from January 14, 2020 until January 29, 2020.

The CD advised that just prior to being moved out of cell 14, he was present when Corrections Officer Christian (hereafter CHRISTIAN) alerted his cell mate, "Chris", that inmates were about to be moved and they should get rid of anything they were not supposed to have.  The CD described CHRISTIAN as a black male in his thirties who was tall and stocky.  This description is consistent with CHRISTIAN.

The CD believes CHRISTIAN advised "Chris" of this because he had given "Chris" a contraband THC pen around the time of the Superbowl (which Det. Martinez verified was played on February 2, 2020). Det. Martinez verified that CHRISTIAN worked in Pod 301 on January 29, 2020 and as a third-floor rover on January 30, 2020. He was next scheduled to be on duty on February 3, 2020 but called in sick.

Jail records confirm that the CD was moved out of cell 14 on January 29, 2020 by CHRISTIAN and that his cellmate had been Christopher Carroll. The CD also expressed safety concerns should this information become public. The CD advised that CHRISTIAN allowed fights to occur between inmates in the pod. The CD alleged that CHRISTIAN would open the doors to sex offenders' cells and tell other non-sex offender inmates something to the effect of, "Do what you got to do." The CD also indicated that CHRISTIAN "banged on me" meaning that when the CD arrived at the jail, CHRISTIAN told him, "This is Crip," and "Crip from Cali." The CD stated that he told CHRISTIAN that he "didn't bang." While the CD believed CHRISTIAN brought the seized cell phone into the jail, he did not have any first-hand knowledge regarding that.

As noted above, SA Pietrzak reviewed several jail records to determine where CD was housed during the events in question. On February 2, 2020, the date the CD reported there was a phone inside the jail that was later recovered February 3, 2020, the CD was housed in Pod 301, cell 25 and had been assigned to Pod 301 since January 14, 2020 and in cell 25 since January 29, 2020. SA Pietrzak reviewed the jail

roster and confirmed that inmates Lance Horntvedt, Maxwell Jones, and Anthony Colbray were also assigned to cell 24 on February 2, 2020.  HORNTVEDT had been assigned to Pod 301 January 27, 2020 and to cell 24 since January 29, 2020.  Prior to that, HORNTVEDT had been housed in Pod 302 since November 15, 2019.  Based upon this review, the suspect inmates were all in a location to have had access to the contraband phone.

On March 18, 2020 Det. Martinez retrieved the cell phone from evidence, which was identified as a black LG smart phone, model number, LML212VL, International Mobile Equipment Identity (IMEI) number as 355987109283621, Serial number: 911VTYK1931362 from the device.  The charging cord seized from Inmate Jones is compatible with this LG cell phone. Inmate Jones was cellmates at that time with HORNTVEDT in cell 24.

A state search warrant from Benton County Superior Court was obtained on April 1, 2020, for the black LG smart phone found in the janitor's closet.  A federal search warrant was also obtained.

**SECOND REPORTING PARTY: BENTON COUNTY JAIL**

On March 18, 2020, Benton County Jail Investigator Larry Smith with the Benton County Sheriff's Office, assisted Det. Martinez with an interview of a reporting party herein referred to as Cooperating Defendant (hereafter CD2).  CD2 stated that he had information on a "dirty CO [Corrections Officer], involving cell phones and drugs in the facility."  CD2 was in Department of Corrections (DOC)

custody serving a sentence for Unlawful Possession of a Firearm in the First Degree and Robbery in the Second Degree. CD2 was transferred from the Benton County Jail to DOC custody in March of 2020. Jail records confirmed that CD2 was assigned to a cell in Pod 302 for over two months prior to his transfer to DOC custody, the relevant period of the investigation. CD2 did not receive any compensation or consideration for providing information to law enforcement and was already under sentence when the information related to this investigation was provided.

CD2 stated that CHRISTIAN was smuggling in cell phones and drugs, passing messages between different pods, and was purposely allowing assaults to occur in the facility. CD2 also stated that CHRISTIAN let inmates know who had "keep separates" [orders separating specific inmates for safety] and who was "snitching". CD2 advised that he had written down specific dates of incidents. This document was recovered by investigators.

CD2 advised that CD2 was aware of two different "loads" of cell phones. CD2 advised that in mid-January of 2020, CHRISTIAN brought in two cell phones, an ounce of methamphetamine, an ounce of heroin, a half ounce of marijuana, and a methamphetamine pipe for $1,000. CD2 advised that CHRISTIAN provided these items to Co-Defendant HORNTVEDT, a.k.a. "Hands." CD2 advised that Alejandro LEON, a.k.a. KIDD, and Joel CERVANTES, a.k.a. Playboy, were also involved in the transactions.

1   CD2 advised that on the date that CHRISTIAN delivered the cell phones to

2   HORNTVEDT, CHRISTIAN was working day shift.  Prior to opening for breakfast,

3

4   CHRISTIAN went into the mop closet with a bag of rags containing cell phones and

5   drugs.  CHRISTIAN left the bag in the closet and told HORNTVEDT that the cell

6   phones were in the closet when he exited the cell.  HORNTVEDT went into the mop

7

8   closet and then went back to his cell. CD2 advised that the master cell phone

9   controlled the data plan for the second cell phone, which was given to LEON.  CD2

10  indicated that the second cell phone was charged in the law library by LEON,

11

12  CERVANTES, Rolando Vargas, and Rey Calderon.  They would push the law cart to

13  the back of the pod where the cell phone was charged.

14      CD2 advised that HORNTVEDT later hid the master cell phone in the janitor's

15

16  closet in Pod 301 and turned the second cell phone data off prior to the discovery of

17  the master cell phone on February 2, 2020.  CD2 advised that LEON broke the second

18  cell phone and disposed of it.  CD2 further stated that the drugs CHRISTIAN

19

20  delivered with the cell phones were left mostly in Pod 302 when HORNTVEDT was

21  transferred to Pod 301, but that HORNTVEDT did take some of the drugs with him.

22  CD2 advised that over the next couple of days corrections officers searched Pod 302

23

24  and found a bag of methamphetamine thrown by the white male inmate in cell 10

25  housed with Rascal, which is a moniker used by Rey Calderon.

26      CD2 stated that LEON paid for "a second load" of two additional cell phones,

27  an ounce of methamphetamine, and an ounce of heroin, which was to again be

28

delivered by CHRISTIAN.  CD2 advised that LEON and CHRISTIAN utilized Text

Now [texting/phone call application used for communication through the internet] to

communicate.  CD2 also stated that CHRISTIAN was communicating with LEON's

girlfriend, Co-Defendant Alyssa CANTU on the outside to pick up the money.  CD2

described that the two phones provided to LEON, occurred the same day LEON and

CERVANTES were caught with marijuana and sub-Oxone strips (referenced below).

Det. Martinez confirmed there was in fact an investigation of narcotics in the jail that

occurred on February 27, 2020, BCSO Case# 20-03341, which involved

CERVANTES and LEON.

According to CD2, CHRISTIAN was supposed to deliver additional drugs later.

When asked who provided the cell phones to CHRISTIAN, CD2 advised that LEON's

girlfriend, CANTU, bought everything and provided it to CHRISTIAN, adding that,

"Nothing out of the $1,000 comes out of Christian's pocket."  CD2 stated that, "All

the dope is wrapped and ready, all he [CO Christian] has to do is pick it up."

CD2 described that on one occasion, CHRISTIAN was supposed to have

brought in drugs but didn't have them.  Instead, on a Friday night before March 11,

2020 when CHRISTIAN went to graveyard shift, he opened LEON's door to charge

his cell phone.  CD2 indicated video should show CHRISTIAN open cell 10 [in Pod

302] which is LEON's cell, grab a newspaper with a cell phone in it, go down to

Inmate Vargas's cell 13, and gave the newspaper to Inmate Vargas.  CD2 advised that

Vargas charged the phone and later in the night CHRISTIAN gave the phone back to

*United States v. Marilou Martinez* - Plea Agreement - 11

LEON.  CD2 advised that CHRISTIAN did not deliver any drugs because they weren't ready through LEON.  The drop of the drugs didn't occur while CD2 was still in jail.  Before CD2 left the jail, however, he advised that LEON text messaged CHRISTIAN if they were good, to which CHRISTIAN replied, "we're good".

Det. Martinez later reviewed video captured on Friday March 6, 2020 before midnight which confirmed that CHRISTIAN did receive the newspaper as reported and that later in his shift on Saturday March 7, 2020, the suspected drop off the phone occurred using toilet paper.  CHRISTIAN was confirmed to be accessing LEON's cell as reported.

CD2 expressed concern over CHRISTIAN endangering the safety of inmates in the jail.  CD2 stated that CHRISTIAN advised LEON and CERVANTES, both confirmed gang members, that the aforementioned "CD" had told corrections officers about the contraband cell phone in the janitor's closet.  In retaliation, gang members ordered the CD to assault Corrections Officer Corey Williams.   Det. Martinez later reviewed the alleged assault reports by jail staff that occurred on February 22, 2020, in Pod 302.  CO Williams reported being assaulted by CD.  CO French reported that based upon interviews of the inmates in Pod 302, there were conflicting statements about why the assault happened.  One inmate reported that the Surenos knew CD, "Was a snitch."

CD2 described another incident where CHRISTIAN assisted inmates in retaliating against another inmate.  CD2 stated that "Drowzee", which is a moniker

1  used by Adrian Antonio Mendoza, got "checked".  CD2 defined "checked" as a gang

2  assault or punishment for perceived wrongdoing by a fellow gang member.  Prior to

3

4  Inmate Mendoza being assaulted, LEON and CERVANTES spoke to CHRISTIAN

5  telling him that they needed to, "check" Inmate Mendoza.  Based on that conversation,

6  CD2 stated that CHRISTIAN purposefully left Inmate Mendoza's cell door open as

7

8  well as other doors on the tier so that Rolando Vargas, who CD2 identified by his

9  moniker "Chato", and Rey Calderon could enter the cell and assault Inmate Mendoza.

10  CD2 advised that CHRISTIAN deflected knowledge of the assault by grabbing the

11

12  law library cart and leaving the tier.  CD2 stated that a couple of days later

13  Corrections Officer Ryan French saw Inmate Mendoza with a black eye and

14  "everyone played stupid."  Det. Martinez later confirmed the report made by Ofc.

15

16  French on February 26, 2020 regarding a possible assault on Inmate Mendoza.  In the

17  report, Det. Martinez observed photographs where Inmate Mendoza had obvious

18  injuries on most of the left side of his face.[1]

19

20       CD2 described another incident where CHRISTIAN permitted retaliation

21  against another inmate related to the assault of Inmate Mendoza.  CD2 described that

22  inmate as a black male who had been in jail for two years for pending charges of

23

24  kicking a baby.  Det. Martinez later identified this inmate as Tristen D. Landry, who

25  _____

26  [1] CD2 also advised that CHRISTIAN brought over a note from a Southside gang
   member in Pod 301 to CERVANTES that stated that Inmate Mendoza messed up by

27  not giving a cut of his profits to the gang after he received money selling post cards
   soaked in methamphetamine that had been mailed to the jail.  CD2 advised the note

28  stated that "this needed to happen [assault]."

has one count of Assault of a Child in the Second Degree pending with an offense date

of March 15, 2018.  CD2 advised that CHRISTIAN told other inmates that Inmate

Landry was "putting my [CO Christian's] name out there" by advising CO French that

CHRISTIAN had allowed the assault on Inmate Mendoza to occur.  When Inmate

Landry was taken "to the hole", CD2 stated that CHRISTIAN allowed other inmates

to go through his property and take his belongings.  CD2 stated that he heard

CHRISTIAN tell Inmate Vargas, "This dude's a rat, he fronted me out, we had to get

him out of here some way or another right?"  CD2 stated that CHRISTIAN was

laughing and added, "I [CO Christian] let them run through his shit" and "He ain't got

nothing left up in there."  Inmate Landry returned from "the hole" the next day and

found his property missing and filed a grievance.  Det. Martinez verified that

CHRISTIAN reported Inmate Landry refused to lock down on February 27, 2020 and

was removed from his cell.  Det. Martinez also located video/picture documentation

corroborating CD2's version of events.

### BENTON COUNTY JAIL PHONE CALLS

The following is a summary of some of the relevant jail calls identified between

the Defendant and Co-Defendant HORNTVEDT concerning the introduction of

contraband into Benton County Jail.

On *February 2, 2020* at 11:09AM, HORNTVEDT called the Defendant

referred to as "MJ" and stated, "The one that you're supposed to meet is a go."  He

told her to tell him that it's a "Him and me thing" and further stated that she will be an

intermediary. HORNTVEDT told the Defendant that he needed "One of those utensils in there" and advised that he needed to "blow those bubbles." He also asked for "flam, flamers."

On *February 3, 2020*, HORNTVEDT again called the Defendant and asked, "Did you get a hold of Cuz (CHRISTIAN), to which the Defendant stated no. He told her to "tap him" and "It's all the way good, it's all the way together, when can I link up with you to post old boy's bond." When the Defendant asked if all she had to do was give him the money, HORNTVEDT advised, "Nah and the… you know what I'm saying… yup yup." The Defendant asked, "Two of those right?" Later that same day (*February 3, 2020*), at 1738hrs, HORNTVEDT called the Defendant and told her that he tried to call, "Paya" (another identified individual who assisted in smuggling drugs) but he didn't get a hold of her. He asked the Defendant if she wanted the number to Paya. The Defendant asked what was it that she was supposed to ask her, and he advised she is supposed to give her, "Two and Two" so, "It can be put in…" HORNTVEDT told the Defendant to get everything ready and hold onto it until it's "all the way put together." The Defendant asked if she was getting anything for this to which HORNTVEDT reacted to this statement as if he was upset and stated that he thought she was there for him and didn't know everything he asked her for would cost him.

The Defendant also received a couple of calls from an inmate identified as "Konjac" or "Jack." For example, on *February 4, 2020* the Defendant told Jack

*United States v. Marilou Martinez* - Plea Agreement - 15

during the call that she was going to meet with, "Homeboy" right now and asked if he wanted her to call, "Cuz" (CHRISTIAN).

On *February 5, 2020*, HORNTVEDT called an unknown male and asked if "she" ever made it. The Unknown subject told HORNVEDT that he gave her (referring to the Defendant) "the band." HORNVEDT gave the male a phone number and told him when he hits her up it's for, "Two-day times, two-night times [Daytime is Methamphetamine and Nighttime is Heroin]."

On *February 6, 2020*, HORNTVEDT made a series of calls again to MJ. The following is a summary:

> 1:39pm: HORNVEDT asked the Defendant if she called "Payasa." When she said no, he asked if she has spoken to Kyle. She advised, "Yesterday." The Defendant also asked if she has spoken to "Cuz" (CHRISTIAN) and she replied no. HORNVEDT gave her a phone number of 572-6094 or 302-4012 for Payasa. He continued to tell the Defendant that if she (Payasa) doesn't answer to get ahold of the homie, "Trucha" at 430-7547 HORNVEDT told the Defendant to tell "Trucha" that they're trying to put something together for the homie "Pollo."
>
> 2:26pm: The Defendant and HORNVEDT talked about 34 vs 24 (monetary amounts) and HORNVEDT stated that it will be 24 because she already has "a band" ($1,000) of his. The Defendant asked if he wanted her to get the five items with it [the band ($1,000)]? HORNVEDT told the Defendant those items are coming to her for free. That, "They are just being tossed to you for me and Po…"
>
> 2:55hrs- HORNVEDT asked what his "Cuz" (CHRISTIAN)said. The Defendant stated, "The last time he messaged me." Then she told

*United States v. Marilou Martinez* - Plea Agreement - 16

HORNVEDT to "hold on." The Defendant then proceeded to read a conversation where she and "cuz" (CHRISTIAN) discussed a "package." HORNVEDT stated, "If not …get two of the daytime" (referring to drugs) HORNVEDT told the Defendant that he wanted her to get "the five [items]." HORNVEDT also told her to at least get the two "daytime." HORNVEDT provided the Defendant with two additional phone numbers to call and again asked her to get two daytime, and a cell phone.

On *February 7, 2020*, another series of calls was made by HORNVEDT to the Defendant:

> 4:40pm- the Defendant stated she tried to get a hold of his people and they don't get back to her. He asked, "You talking about Pollo?" She advised, "Yeah." He instructed her to do the other thing I told you, "Just do the daytime" and to call "Cuz" (CHRISTIAN). HORNVEDT told her to put it all together and that he was giving "him" two bands ($2,000). The Defendant asked "that's what it's worth to him?" HORNTVEDT stated yea. 5:01pm- HORNTVEDT advised that the band ($1000) the Defendant got from Kyle and the band she is supposed to pick up tonight go to "Cuz" (CHRISTIAN) 6:15pm- the Defendant stated that she was going to go to Othello to pick up her mother's car because her vehicle wasn't working. HORNTVEDT told her that she should be getting, "$2,400." MJ brought up being, "in the hole [money]." HORNTVEDT stated that he doesn't like to talk specifics about money on this phone. HORNTVEDT again asked if she got a hold of Kyle and to go ahead and get the "two daytime."

On *February 10, 2020*, HORNTVEDT called the Defendant who stated that "Cuz" (CHRISTIAN) don't like to answer calls." HORNTVEDT stated, "It's a

*United States v. Marilou Martinez* - Plea Agreement - 17

different line but it's good." That same day at 1823hrs, HORNTVEDT called the

Defendant and told her to call Cuz (CHRISTIAN)and to link up with him today at

7pm. The Defendant stated that she needed to get a hold of the stuff first.

HORNTVEDT asked if the Defendant still had the stuff from Kyle, to which she

responded that she did.

On *February 12, 2020*, HORNTVEDT called the Defendant who stated her

roommate was going to call the cops over a dispute. HORNTVEDT asked, knowing

that you (MJ), "have all the stuff." MJ does not respond or acknowledge. Later that

same day, HORNTVEDT called the Defendant and told her to call that number…"

"the 541." He also asked her, "What's up with that bitch?" (referring to the

roommate). The Defendant asked what you want to know, he replied that he didn't

want her to say a lot on this phone [recorded line]. HORNTVEDT asked her for "one

of the daytimes" "that way I can travel with it" (referring to another POD or jail which

did in fact occur several days later). The Defendant then stated she knew, "Nine

strippers" (referring to suboxone strips). HORNTVEDT told her, "Put those in there

too." HORNTVEDT stated he was going to call Cuz (CHRISTIAN) and let him

know to, "Tap your shit [call her]."

On February 15, 2020, HORNTVEDT called the Defendant and asked about

Kyle stating to wait to the first [of the month] when he had more. The Defendant

advised that Kyle asked if it came from the rack ($1000) that he gave her or if it's

separate. She told Kyle that he (Kyle) was getting it separate. Kyle advised that he

was low on money.  HORNTVEDT told her to be nice to Kyle.  He asked her, "Do you have anyone else giving you a free $1,000 right now?"

On *February 16, 2020*, HORNTVEDT called the Defendant and she asked, "Was the phone for me?"  HORNTVEDT stated, "No, the phone was for me."  He advised that "It was late in the game."  He advised he didn't know how she would link up with Cruz (CHRISTIAN).  He asked if she was heading out; she advised she was heading out in a couple of hours.

On *February 18, 2020*, HORNTVEDT called the Defendant and asked if homie hit her up yesterday.  MJ stated yes, but the homie was supposed to get a hold of her tomorrow.  At 0849hrs, HORNTVEDT again called the Defendant who stated she was going to make a couple of trips.  HORNTVEDT asked about phone number 331-9438. The Defendant stated it's a Text Now.  HORNTVEDT advised that he talked to Cuz and that he was going to have Cuz tap her line so they can handle it and he (HORNTVEDT) can be good.  He directed the Defendant to go get those phones and the chain for him.

**ADDITIONAL CONTRABAND SEIZURES AT BENTON COUNTY JAIL**

Based upon the above information from CD and CD2, Det. Martinez pulled all contraband seizures during the relevant time-period of this investigation.

On *January 29, 2020*, Det. Martinez confirmed that while in Pod 302, the same Pod as LEON and HORNTVEDT, Co-Defendant KINSEY was found to have approximately 1.6 grams of methamphetamines, 4 yellow pills, .3 grams of Heroin, 1

gram of Marijuana[2] These narcotics are of the same type that was spoken about being given to CHRISTIAN to smuggle into Benton County Jail, described as green being Marijuana, clear or daytime being Methamphetamine, black or nighttime being Heroin.

On *February 27, 2020*, Benton County Corrections officers found contraband after a search due to information of possible drugs inside the same Pod. CERVANTES was found to have a bundle of a white powder inside a latex glove tip inside his underwear, after a body search. BSCO Det. Mehline requested the nurse to test the white powder it was positive for Suboxone. The nurse confirmed that CERVANTES was not on a Suboxone regiment. During this search LEON was found to have a Marijuana like substance inside his underwear inside a latex fingertip. Both drugs were tested by WSP Lab found to be Suboxone and Marijuana.

On *April 21, 2020*, at 2:20PM, Benton County Corrections Officer (CO) Haynes was approached near Pod 302 by LEON. According to CO Haynes, LEON requested to use the law library located in the multi-purpose room. As LEON arrived in the law library, CO Haynes noticed that he was carrying a manila envelope that appeared to Haynes to contain paperwork. CO Haynes observed LEON unplug the law library (computer) from the back wall and move it to the wall behind CO Haynes' desk. Based upon knowledge that other contraband had recently been introduced into

---

[2] CD2 had also identified Co-Defendant KINSEY as being present and involved during one of the contraband shipments.

the jail, CO Haynes reported this activity to be suspicious.   After approximately 15 minutes, CO Haynes looked into the room and observed a phone cord charger plugged into the outlet where the law library (computer) was originally located.  CO Haynes contacted Corporal Nelson and advised of the possible contraband. Corporal Nelson advised CO Haynes to leave LEON in the multi-purpose room until additional Corrections Officers arrived.

CO McMaster arrived at the multi-purpose room and as the door was opened, CO McMaster placed wrist restraints on LEON. Corrections Officers Rolloson, Forbes, and Tanska searched LEON's property and found a cellular phone and a charging cord hidden in LEON's manila envelope along with paperwork. The cellular phone and charging cord were seized as contraband and turned over to Benton County Sheriff's Det. Martinez.

On *April 23, 2020*, DEA Tri-Cities Task Force Officer (TFO) Thomas Orth while monitoring phone calls of LEON from the Benton County Jail learned that he was in solitary confinement. LEON was being held at the Benton County jail on federal drug charges. *See*, 19-CR-6062-SMJ.  On April 24, 2020, TFO Orth and Special Agent (SA) Kurt Mitchell contacted Det.  Martinez and requested the reports of what had occurred involving LEON being in possession of contraband (Cellular phone). Detective Martinez relinquished custody of the black LG cellular phone bearing IMEI:353566111505544 to TFO Orth.  A federal search warrant was

subsequently obtained to search the cell phone. A search of the phone revealed that a large volume of data had been deleted but offered relevant evidence as noted below.

**ARREST OF THE DEFENDANT AND SEIZURE OF CELLULAR PHONE**

On *April 20, 2020*, according to reports from Adams County, an Adams County Sheriff's Deputy on patrol observed the Defendant outside of 610 S. Andes Rd, Othello WA, Adams County. He confirmed she had a felony warrant out of Franklin County and placed her under arrest. Search incident to arrest, the deputies reported finding a white powdery substance in a baggie in her pocket. As the Defendant was suspected in the above investigation, there was an alert to contact Det. Martinez if she was encountered by police. As a result, the deputies contact Det. Martinez who asked the Deputies on scene if the Defendant had a cellphone on her. The deputies advised there was not one on her person, but one was observed in the Ford Taurus where she was located. Det. Martinez stated he was going to call her identified number from the jail calls (509)237-2853, using a restricted number. Within seconds, the phone within the Ford Taurus received an incoming call from a restricted number. The phone was collected by the Adams County Deputies, and later was turned over to Det. Martinez.

A search warrant was subsequently obtained to download the contents of the cell phone. Relevant information was located on the phone and summarized below.

**INTERVIEW OF CD3**

On *May 5, 2020*, SA Pietrzak along TFO Orth, were present when Det. Martinez conducted a non-mirandized, witness interview of another cooperating

*United States v. Marilou Martinez* - Plea Agreement - 22

defendant, hereafter referred to as CD3.  No promises were made to CD3 in exchange for information and CD3 has not received any consideration for the information provided.  CD3 admitted CD3 was able to enlist a guard to help smuggle contraband into Benton County Jail.  When asked if it was CHRISTIAN, CD3 stated yes.  CD3 advised there were several shipments of contraband to into the jail during the period of the Conspiracy to include phones, heroin, and methamphetamines.

### EVIDENCE DERIVED FROM JAIL CALLS, CELL PHONES AND TEXT NOW MESSAGES

As noted above, several cell phones have been seized to include contraband cell phones inside the jail.  Search warrants were obtained to download these phones.  Moreover, search warrants were obtained for various Text Now accounts utilized by CHRISTIAN and other Co-Defendants.   Moreover, Det. Martinez and SA Paetra have listened to a large number of recorded jail calls and reviewed a number of video recordings from inside Benton County Jail.  Based upon the collection of this evidence, there is a large volume of records which have corroborated information provided by CD, C2 and CD3 and also identified several other co-conspirators to include the Defendant and Co-Defendant SANDERS, who were also a part of this criminal conspiracy.

Amongst the evidence gathered from these sources, are actual communications from CERVANTES and LEON utilizing the identified contraband cell phones with CHRISTIAN as well as communications between CHRISTIAN, SANDERS, and

CANTU.  These communications clearly establish that Co-Defendant HONRVENDT, LEON and CERVANTES, were working with CHRISTIAN to smuggle contraband into the jail.  The contraband included cell phones, methamphetamine, heroin, suboxone and marijuana.  The United States would present further evidence that LEON and HORNVENDT would contact Co-Defendants who were out of custody, to include the Defendant, SANDERS, and CANTU, and direct them to obtain the illegal contraband and meet up with CHRISTIAN.  CHRISTIAN would then communicate with SANDERS, the Defendant and CANTU to meet up and obtain the contraband and then smuggle it into the jail for LEON, CERVANTES and HORNVENDT.   This all occurred during the time-period of the alleged conspiracy.

Det. Martinez also obtained the subscriber information for the Text Now account utilized to communicate with several members of this conspiracy.  Charter Communications, an internet provider, sent the requested information, which stated the subscriber of the IP address 66.191.10.128 was used to download the Text Now application to be Jennifer Christian at the time on November 28, 2016 1816 hrs, located at 8515 W Entiat Ave. Kennewick WA, with the contact email of Eric0587@Live.com.  This was confirmed to be CHRISTIAN's wife and address, confirming he was the user of the Text Now account.

6. <u>The United States Agrees:</u>

   (a).    <u>To Dismiss the following:</u>

   *Count 2-* Attempt to Provide Prohibited Objects to an Inmate of a Prison, in violation of 18 U.S.C. § 1791(a)(1), (b)(1), (b)(2), (b)(3), (b)(4) and (c).

   (b).    <u>Not to File Additional Charges:</u>

   The United States agrees not to bring any additional charges against the Defendant based upon information in its possession at the time of this Plea Agreement and arising out of Defendant's conduct involving illegal activity charged in Indictment 4:20-CR-6029-SAB, unless the Defendant breaches this Plea Agreement.

7. <u>United States Sentencing Guideline Calculations:</u>

   The Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "USSG") are applicable to this case and that the Court will determine the Defendant's applicable sentencing guideline range at the time of sentencing.

   (a).    <u>Base Offense Level and Specific Offense Characteristics:</u>

   The parties will argue the applicable base offense level at the time of sentencing.  The parties agree and stipulate that no other special offense characteristics apply to this Defendant.

   (b).    <u>Acceptance of Responsibility:</u>

   If the Defendant pleads guilty and demonstrates a recognition and an affirmative acceptance of personal responsibility for the criminal conduct; provides complete and accurate information during the sentencing process; does not commit

any obstructive conduct; accepts this Plea Agreement; and enters a plea of guilty no later than the next Pre-Trial Conference, the United States will move for a three (3) level downward adjustment in the offense level for the Defendant's timely acceptance of responsibility, pursuant to USSG §3E1.1(a) and (b).

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, not recommend a three (3) level downward reduction for acceptance of responsibility if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

Furthermore, for each count of conviction, the Defendant agrees to pay the $100 mandatory special penalty assessment to the Clerk of Court for the Eastern District of Washington, at or before sentencing, and shall provide a receipt from the Clerk to the United States before sentencing as proof of this payment, as a condition to this recommendation by the United States.

  (c). <u>Criminal History</u>:

The United States and the Defendant understand that the Defendant's criminal history computation is tentative and that ultimately the Defendant's criminal history category will be determined by the Court after review of the Presentence Investigative Report. The United States and the Defendant have made no agreement and make no representations as to the criminal history category, which shall be determined after the Presentence Investigative Report is completed.

8.  Departures/Variances:

The Defendant might request a downward departure or variance from the

sentencing guidelines. The United States is free to argue against them.

9.  Length of Incarceration:

The parties are free to recommend any lawful sentence.

10.  Criminal Fine:

The United States and the Defendant are free to make whatever

recommendation concerning the imposition of a criminal fine that they believe is

appropriate.

11.  Supervised Release/Probation:

The parties agree to recommend a 3-year term of supervised release/probation.

The parties further agree to include the following special conditions, in addition to the

standard conditions of supervised release: that the Defendant's person, residence,

office, vehicle, and belongings are subject to search at the direction of the Probation

Office and that the Defendant have no contact with co-defendants or potential

witnesses.

12.  Mandatory Special Penalty Assessment:

For each count of conviction, the Defendant agrees to pay the $100 mandatory

special penalty assessment to the Clerk of Court for the Eastern District of

Washington, at or before sentencing, pursuant to 18 U.S.C. § 3013 and shall provide a

receipt from the Clerk to the United States before sentencing as proof of this payment.

F

13.    Payments While Incarcerated:

If the Defendant lacks the financial resources to pay the monetary obligations imposed by the Court, the Defendant agrees to earn the money to pay toward these obligations by participating in the Bureau of Prisons' Inmate Financial Responsibility Program.

14.    Additional Violations of Law Can Void Plea Agreement:

The Defendant and the United States agree that the United States may at its option and upon written notice to the Defendant, withdraw from this Plea Agreement or modify its recommendation for sentence if, prior to the imposition of sentence, the Defendant is charged or convicted of any criminal offense whatsoever or if the Defendant tests positive for any controlled substance.

15.    Appeal Rights:

In return for the concessions that the United States has made in this Plea Agreement, the Defendant agrees to waive her right to appeal the conviction and sentence if the Court imposes a prison term no higher than the high end of the applicable guideline range as determined by the Court and imposes no more than 3 years supervised release or probation.  Defendant further expressly waives her right to file any post-conviction motion attacking her conviction and sentence, including a motion pursuant to 28 U.S.C. § 2255, except one based upon ineffective assistance of counsel based on information not now known by Defendant and which, in the exercise of due diligence, could not be known by Defendant by the time the Court imposes the sentence.  Should the Defendant successfully move to withdraw from this Plea

Agreement or should the Defendant's conviction on 4:20-CR-6029-SAB be dismissed, set aside, vacated, or reversed, the Plea Agreement shall become null and void; the United States may move to reinstate all counts of Indictment 4:20-CR-6029-SAB; and the United States may prosecute the Defendant on all available charges involving or arising out of Indictment 4:20-CR-6029-SAB. Nothing in this Plea Agreement shall preclude the United States from opposing any post-conviction motion for a reduction of sentence or other attack of the conviction or sentence, including, but not limited to, proceedings pursuant to 28 U.S.C. § 2255 (writ of habeas corpus).

16.    Integration Clause:

The United States and the Defendant acknowledge that this document constitutes the entire Plea Agreement between the United States and the Defendant, and no other promises, agreements, or conditions exist between the United States and the Defendant concerning the resolution of the case. This Plea Agreement is binding only upon the United States Attorney's Office for the Eastern District of Washington, and cannot bind other federal, state, or local authorities. The United States and the Defendant agree that this agreement cannot be modified except in a writing that is signed by the United States and the Defendant.

Approvals and Signatures

Agreed and submitted on behalf of the United States Attorney's Office for the Eastern District of Washington.

Joseph H. Harrington
Acting United States Attorney

*Stephanie Van Marter*                          7/29/2021
Stephanie A. Van Marter                       Date
Assistant U.S. Attorney

I have read this Plea Agreement and have carefully reviewed and discussed every part of the agreement with my attorney. I understand and voluntarily enter into this Plea Agreement. Furthermore, I have consulted with my attorney about my rights, I understand those rights, and I am satisfied with the representation of my attorney in this case. No other promises or inducements have been made to me, other than those contained in this Plea Agreement and no one has threatened or forced me in any way to enter into this Plea Agreement. I am agreeing to plead guilty because I am guilty.

*Marilou Martinez*                              7-29-21
Marilou Martinez                              Date
Defendant

I have read the Plea Agreement and have discussed the contents of the agreement with my client. The Plea Agreement accurately and completely sets forth the entirety of the agreement between the parties. I concur in my client's decision to plead guilty as set forth in the Plea Agreement. There is no legal reason why the Court should not accept Defendant's plea of guilty.

_____              7/29/21
Houston Goddard                               Date
Attorney for Defendant

*United States v. Marilou Martinez* - Plea Agreement - 30